File Name: 09a0318n.06

Filed: May 4, 2009

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 08-1854

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

JASON DREYER,

      Plaintiff-Appellant,

v.

EXEL INDUSTRIES, S.A.; KREMLIN-
REXSON, S.A.; EXEL NORTH AMERICA,
INC.; EXEL INDUSTRIES, INC.; KREMLIN,
INC.,

      Defendants-Appellees.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

_____/

Before:      MARTIN, SUHRHEINRICH, GIBBONS; Circuit Judges.

BOYCE F. MARTIN, JR., Circuit Judge. Under Michigan law, is the manufacturer or

distributor of a paint sprayer liable for a user's burn injuries where the solvent used to clean the

sprayer ignited? We hold that neither is liable and thus affirm the district court's grant of summary

judgment in their favor, although under slightly different reasoning.

I.

The plaintiff, Jason Dreyer, a maintenance employee for Oakland County Schools, was

assigned to paint over a hundred file cabinets with a paint sprayer. The paint sprayer was owned by

Oakland Schools and had been manufactured by one of the defendants, Kremlin-Rexson SA[1] in Stains, France. The sprayer came with a pair of instruction manuals entitled, "Manual Electrostatic Gun" and "Electrostatic Power Supply," written by Kremlin-Rexson. The sprayer consists of a spray gun and a power supply box. The sprayer takes paint from a can, draws it through a hose to a spray gun, and then discharges the paint into very fine particles which are given a positive electric charge as they pass from the nozzle of the gun.

The French manufacturer sold the paint sprayer to a distributor in the United States, Exel North America, Inc., a co-defendant, through its predecessor company, Kremlin, Inc., also a co-defendant. Exel North America, Inc. sold the sprayer to a retailer SprayMax, and Oakland Schools bought it from there in 1999. SprayMax trained one of Oakland Schools' maintenance employees to use the sprayer and that employee trained Dreyer.

For some time, Dreyer had been having problems with the paint sprayer clogging or "gumming up." Following one of the sprayer's manual's instructions to "consult immediately your local authorized KREMLIN distributor" with repair questions, Dreyer telephoned a Kremlin technician in Chicago. According to Dreyer, the technician told him to use methyl ethyl ketone ("MEK"), a solvent, to clean the sprayer and thin paint. Dreyer also says he sent the paint sprayer to the distributor for repair.

After this conversation (and presumably once Kremlin returned the paint sprayer), Dreyer began painting the file cabinets. He painted in a basement room of the Oakland Schools building

---

[1]     According to Kremlin-Rexson SA, its co-defendant, Exel Industries SA, is merely a holding company.

known as the "bunker"—a concrete room approximately fifty feet long and twenty feet wide. An opening in an exterior wall opens to the outside and is fitted with adjustable louvers that can be opened or closed to provide the bunker with ventilation. Dreyer powered the paint sprayer by plugging it, along with the electric cord from an air compressor (used to clean the paint sprayer) into the outlets of a power strip that was plugged into a wall receptacle. The power strip had an electric switch that could be flipped "on" or "off" to provide power to all of the outlets in the strip.

On April 14, 2003, upon reaching the end of his shift, Dreyer completed his painting for the day, turned off the two power switches on the sprayer's supply box, and flushed out the hoses with MEK manufactured by Sherwin-Williams. After he finished cleaning the sprayer, Dreyer closed the louvers in the wall opening and unplugged an electric box fan located in front of the louvers. He also plugged in a radio and put it in the wall opening for better reception to hear a broadcast of a hockey play-off game. The doors from the bunker to the hallway remained open. Dreyer then removed his flame retardant coveralls and his respirator and flipped the electric switch on the power strip to the "off" position with his foot. Dreyer said that a spark was created at his foot when the switch flipped, resulting in a fire explosion. Dreyer's shoes and pants caught fire and he was severely burned.

The instruction manuals accompanying the paint sprayer provided a list of warnings, which Dreyer had read. Among them was the following:

> Spraying, cleaning, and servicing must be made in a ventilated areas so that
> solvent vapors are properly drained
>
> Cleaning and flushing of the electrostatic coating system must be carried out in
> a ventilated area
> . . .

Storage of paint and solvent drums near or inside the spraying area is prohibited. Keep all fluid containers properly closed in a non-hazardous area

Use cleaning solvents with the lowest flash point — If possible, higher than ambient temperature.

STD 9 power supply unit must be installed in a non-hazardous area. Moreover, it must be located 4 meters (13 ft) at least away from any flammable vapor emissions

The ON/OFF on the power supply gun must be OFF before starting cleaning operation

The MEK that Dreyer used to clean the sprayer on the night of the explosion, manufactured by Sherwin-Williams, came with the following warning on its label:

DANGER! EXTREMELY FLAMMABLE—VAPORS CAN CAUSE FLASH FIRES! HARMFUL IF INHALED—MAY AFFECT THE BRAIN OR NERVOUS SYSTEM, CAUSING DIZZINESS, HEADACHE OR NAUSEA. IRRITATES EYES, SKIN AND RESPIRATORY TRACT.

. . .

Contents are EXTREMELY FLAMMABLE. Keep away from heat, sparks, and open flame. Vapors will accumulate readily and may ignite explosively. During use and until all vapors are gone: Keep area ventilated - Do not smoke - Extinguish all flames, pilot lights and heater—Turn off stoves, electric tools and appliances, and any other source of ignition.

The local fire marshal, Frederick Arnold, responded to the fire. He reported that there were at least six five-gallon cans of MEK and some smaller cans in the bunker when he arrived. In Arnold's opinion, the fire occurred when Dreyer turned off the power strip and a spark ignited the MEK vapors. The Oakland Schools' insurer also created a report regarding the fire. Its investigator,

Al Wehrli, concluded that the fire originated at the power strip from a spark when it was turned off

or when its plug was removed from the wall and ignited the fumes in the painting area.

Dreyer sued the paint sprayer's manufacturer (Kremlin-Rexson SA, partially owned by the

co-defendant Exel Industries, SA) and its distributor (Exel North America, Inc, the successor

company to the co-defendants Exel Industries, Inc. and Kremlin, Inc.) claiming negligence and

breach of warranty. The manufacturer and distributor, represented by different counsel, separately

moved for summary judgment. The district court heard argument on the motions and considered the

record before it, including reports from the fire marshal and insurance investigator, as well as

Dreyer's proposed expert report by Dr. Nathan Dorris. Dorris, an "expert in warnings and human

factors," concluded that the warnings on the sprayer were unreasonable and inadequate to alert the

paint sprayer's user to the potential for fire and explosion associated with misuse of the sprayer. The

district court granted summary judgment in favor of the defendants. Dreyer appeals.

## II.

We review a district court's grant of summary judgment *de novo*. *Sigler v. Am. Honda

Motor Co.*, 532 F.3d 469, 482 (6th Cir. 2008).

## III.

### A. Michigan law does not impose on a manufacturer a duty to warn of dangers associated with another manufacturer's products

Dreyer did not sue the MEK manufacturer, Sherwin-Williams, or the unknown manufacturer

of the power strip. Rather, he sued the manufacturer and distributor (but not the retailer) of the paint

sprayer. We first consider his claim that the manufacturer is liable because it failed to provide

adequate warnings of the dangers associated with MEK.

A failure to warn claim requires a plaintiff to prove: "(1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered damages." *Croskey v. BMW of N. Am.*, 532 F.3d 511, 516 n.2 (6th Cir. 2008) (citing *Gregory v. Cincinnati Inc.*, 538 N.W.2d 325, 329 (Mich. 1995)). "Under Michigan law, the manufacturer of a product has a duty to warn of danger associated with the intended uses or reasonably foreseeable misuses of its product." *Allen v. Owens-Corning Fiberglas Corp.*, 571 N.W.2d 530, 535 (Mich. Ct. App. 1997). Whether a manufacturer owes a duty to a particular person is a legal question for the court, *Pettis v. Nalco Chem. Co.*, 388 N.W.2d 343, 348 (Mich. Ct. App. 1986), and depends on whether the plaintiff's use of the product and the injury that resulted were foreseeable, *Thomas v. Int'l Harvester Co.*, 225 N.W.2d 175, 177 (Mich. Ct. App. 1974).

Dreyer contends that Michigan imposes liability on a manufacturer who fails to warn of dangers associated from the foreseeable use of its product, where the danger results from the *combination* of its product and a product manufactured by another. In other words, he argues that a duty to warn exists whenever it is "foreseeable" that a product's intended use (or foreseeable misuses) will expose users to risks created by the product of another—in this case Sherwin-Williams's MEK. Not surprisingly, the manufacturer disagrees and argues that in Michigan, a manufacturer's duty to warn is limited to the manufacturer's own products.

Arguably, the MEK ignition could be considered a "danger associated with" the paint sprayer because it was foreseeable to the manufacturer that a user would employ MEK to clean the sprayer.

As Dreyer points out, a representative from the manufacturer testified that MEK was an appropriate cleaning solvent. And, according to Dreyer, a Kremlin distributor suggested he use MEK. But our review of Michigan caselaw, as well as cases arising in other jurisdictions, indicates that courts have not extended manufacturer liability to products manufactured by another, even when used in combination, unless the manufacturer's own product creates the risk of harm.

The closest Michigan case is *Brown v. Drake-Willock Int'l, Ltd.* There, the Michigan Court of Appeals rejected a dialysis technician's failure to warn claim against the manufacturer of a dialysis machine following her injuries resulting from exposure to formaldehyde that she used to clean it. 530 N.W.2d 510, 515 (Mich. Ct. App. 1995). The defendant manufacturer argued that it had no duty to warn of the dangers associated with formaldehyde because it neither manufactured nor supplied the chemical. The plaintiff pointed out that the manufacturer had recommended formaldehyde to clean its machines and anticipated that it would be used in connection with its product. The *Brown* court rejected the argument, holding that "the law does not impose upon manufacturers a duty to warn of the hazards of using products manufactured by someone else." *Id.* at 515. The court noted that "formaldehyde [was] not related directly to the safe operation of defendants' dialysis machines," and that "plaintiff did not allege that the dialysis machines themselves were dangerous or defective." *Id.* at 514.

Earlier Michigan cases also declined to extend manufacturer liability for injuries sustained by products manufactured by someone else, even when the defendant's product was tangentially involved in the injury. For example, in *Spaulding v. Lesco International Corp.*, 451 N.W.2d 603, 604, 606 (Mich. Ct. App. 1990), the court held that Sears, Roebuck and Company, which had written

a manual on how to install above-ground pools, did not owe a duty to warn of the dangers associated with doing a "deep dive into a four-foot-deep above-ground pool from the platform on top of the pool's ladder." *Id.* (observing that "Sears had no duty to warn of the alleged dangers of another's product").

Dreyer identifies the "primary error" by the district court as its failure "to recognize that the paint sprayer requires the use of solvents, ventilation, and power to operate, and that the manual which includes warnings and instructions that reference solvents, ventilation, and power are part of the product." But even when it is foreseeable that a product will be used in combination with another, courts in Michigan and in other jurisdictions have declined to impose liability on a manufacturer for the product it did not manufacture. *See*, *e.g.*, *Brown*, 530 N.W.2d at 515; *Lindstrom v. A-C Prod. Liab.* Trust, 424 F.3d 488, 496 (6th Cir. 2005) (holding that a pump manufacturer "cannot be held responsible for the asbestos contained in another product" used in connection with the pump).[2]

In this case, the paint sprayer's manufacturer did not manufacture or supply the power strip

---

[2]

> *See also Taylor v. Elliott Turbomachinery Co.*, Inc., 90 Cal. Rptr. 3d 414, 425 (Ct. App. 2009) (manufacturers of pieces of equipment used in navy aircraft carriers, some of which included asbestos-containing parts manufactured by third party, had no duty to warn of dangers inherent in asbestos-containing materials); *Simonetta v. Viad Corp.*, 197 P.3d 127, 134 (Wash. 2008) (en banc) (manufacturer did not have a duty to warn of danger posed by asbestos insulation that it did not manufacture, sell or supply, even though the evaporator it manufactured was built with the knowledge that insulation was required for proper operation); *Clearly v. Reliance Fuel Oil Assocs.*, 17 A.D.3d 503 (App. Div. 2005) (manufacturer of water heater had no duty to warn of dangers of misplacing a temperature control device it did not manufacture in its product). *But see Ilosky v. Michelin Tire Corp.*, 307 S.E.2d 603, 610 (W.Va. 1983) (manufacturer of radial tires had duty to warn of hazard crated by mixing radial tires and conventional tires).

or the MEK that were involved in the explosion. Like the formaldehyde in *Brown*, MEK was not "related directly" to the safe operation of the paint sprayer. Instead of distinguishing *Brown*, Dreyer argues that the paint sprayer itself was defective because it tended to clog and the clogging caused him to use MEK instead of a weaker paint thinner—resulting in his injuries. This argument does not support Dreyer's negligence claim against the sprayer's manufacturer because although the sprayer may have had a clogging defect, that defect was not the "danger" that caused Dreyer's injuries—rather it was the ignition of MEK vapors in an inadequately ventilated room.

We conclude that Michigan courts would be unwilling to impose a duty on the paint sprayer manufacturer to warn of the dangers of a fire resulting from the combination of MEK vapors and a power strip spark. Although the district court granted summary judgment on the ground that Dreyer failed to establish that the paint sprayer was the proximate cause of his injuries, we do not reach the causation question because we conclude that, under Michigan law, the manufacturer was under no duty to warn of the dangers that caused Dreyer's injuries. Thus, any inadequacies in the warnings related to the dangers of MEK contained in the paint sprayer's user manual do not render the paint sprayer defective. We affirm the grant of summary judgment in the manufacturer's favor.

> *B. The distributor did not breach an implied warranty or*
> *neglect a duty to warn of dangers associated with a*
> *product manufactured by another*

Dreyer also sued the paint sprayer's United States distributor, alleging that it breached an implied warranty and was negligent in failing to warn him of the dangers associated with MEK.

Under Michigan law, a plaintiff was traditionally not required to prove a non-manufacturing seller's negligence to recover for breach of warranty.[3]  *See Croskey* at 520.  But in 1996, the Michigan legislature enacted a statutory revision to its tort law that limits a non-manufacturing seller's liability to instances where "[t]he seller failed to exercise reasonable care, including breach of any implied warranty, with respect to the product and that failure was a proximate cause of the person's injuries."  *Id.* (quoting Mich. Comp. Laws. § 600.2947(6)(a)).  This Court has interpreted that revision to indicate "that the legislature did not intend failure to exercise reasonable care and breach of implied warranty to be separate products liability claims."  Id.  Thus, the statute "added an element of fault to the traditional breach of implied warranty," *id.*, and so "the plaintiff must show that the product was sold in a defective condition, the defect caused his injury, *and* the seller failed to exercise reasonable care."  *Id.*

As explained above, we conclude that the paint sprayer was not defective due to inadequate warnings regarding the dangers of MEK because the manufacturer did not owe a duty to issue those warnings.  Consequently, Dreyer cannot show that "the product was sold in a defective condition," *see id.*, and the paint sprayer's distributor therefore is not liable for a breach of an implied warranty.[4] *See Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176, 181-82 (Mich. 1984) (observing that "whether a suit

---

[3]

We assume without deciding that a distributor, who is not the ultimate seller, falls within the scope of Mich. Comp. Law. § 600.2947's definition of "seller."

[4]

Dreyer argues that the corporate relationship between the manufacturer and the distributor was so close that they should be held jointly and severally liable.  Because we conclude that the manufacturer was not under a duty to warn, this argument is irrelevant. It is unnecessary for us to consider whether the distributor might be liable for the negligence of the manufacturer or vice versa under the "pierce the corporate veil" theory Dreyer presents.

is based upon negligence or implied warranty, we require the plaintiff to prove that the product itself is actionable—that something is wrong with it that makes it dangerous").

Finally, Dreyer argues that, because the paint sprayer's distributor recommended that he use MEK to clean the sprayer, it was negligent in failing to provide adequate warnings on the safe use of MEK. There are a few problems with such a claim. First, Dreyer offers no support for the proposition that a non-manufacturing seller is under a duty to warn of dangers associated with a product manufactured by another. Second, in *Croskey*, this Court rejected a reading of Mich. Comp. Law § 600.2947(6)(a) that would recognize a seller negligence claim that stands alone from an breach of implied warranty claim. 532 F.3d at 520 ("[T]he legislature did not intend failure to exercise reasonable care and breach of implied warranty to be separate products liability claims."). Finally, and perhaps most importantly, as we know from *Brown*, where the manufacturer recommended the use of formaldehyde to clean its dialysis machine, under Michigan law, a "recommendation" to use a product manufactured by another does not create a duty to warn of the dangers associated with that product. 530 N.W.2d at 514-15. We have no reason to believe that Michigan courts would countenance such a result.

IV.

We AFFIRM.