**Robert BURGETT; Donna Burgett,
Plaintiffs–Appellants,**

v.

**TROY–BILT LLC; MTD Products Inc.; Lowe's Home Improvement, LLC; Lowe's Home Centers, Inc., Defendants–Appellees.**

No. 13–6327.

United States Court of Appeals, Sixth Circuit.

Sept. 2, 2014.

BEFORE: CLAY and STRANCH, Circuit Judges; BLACK, District Judge.*

CLAY, Circuit Judge.

In this products liability action, Plaintiffs Robert Burgett ("Burgett") and his wife, Donna Burgett, appeal from the district judge's disqualification of their expert and grant of summary judgment in favor of Defendants MTD Products Inc. and Troy–Bilt LLC (collectively, "MTD"), and Lowe's Home Centers, Inc. and Lowe's Home Improvement, LLC (collectively, "Lowe's"). For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### I. THE ACCIDENT

On January 28, 2010, Burgett purchased a Troy–Bilt Bronco riding lawn mower from the Lowe's store in Paintsville, Kentucky. The mower was designed and manufactured by MTD Products Inc., but Lowe's had to do some assembly before the mower could be sold. The specific mower Burgett bought also had a dead

---

* The Honorable Timothy S. Black, United States District Judge for the Southern District    of Ohio, sitting by designation.

battery that the Lowe's staff replaced before Burgett brought the mower home. This action focuses on one of the mower's safety features—a seat switch system. The seat switch is designed to detect whether someone is sitting in the driver's seat. If the seat is occupied, the mower will function. But if the driver gets out of the seat while the mower blades are turning, the seat switch system should stop the mower's blades and engine within five seconds of being triggered.

Burgett used his new mower just a few times between January 2010 and June 10, 2010. At about noon on that date in June, Burgett gassed up the mower and began to mow his lawn. All went smoothly until about 1:30 p.m. Burgett described what happened next at his deposition:

> As I was coming up the bank on the mower, as I got up to the top, approximately to the top, the mower started rising in the front end. The mower come all the way up, and come up, and come back. Reared up, and come back, and as it come back, it throwed me off the right-hand side, and down the hill. It hit it on the top, and crushed the canopy [a covering over the driver's seat], and kicked back on its wheels. As it kicked back on its wheels, it made a right-hand turn, and come down the hill right at me, and I could not get out of the way, and it run over my [right] foot.

(R. 95–6, Burgett Dep., at 2212.) The seat switch should have shut down the mower and the blades, but the mower continued to run as though possessed. According to Burgett, after the mower ran over his right foot, it continued down the slope of his yard, across the driveway at the bottom, and wedged itself against a tree stump—its engine still running and tires still turning. No one witnessed the accident, but Burgett's neighbor did hear something happen with the mower.

Burgett's injuries were gruesome. The mower cut several deep gashes in his right foot. Burgett remained in the hospital for almost three weeks, and had to walk with a cane for another six months. However, one statement from Burgett's medical records suggests an explanation for the accident that differs from Burgett's version. The attending physician's notes for the date of the accident state that Burgett "was riding his riding mower when it started to tip over. He put his right foot out for balance and ran over his right foot with his mower." (R. 97–7, Med. Records, at 2571–72.) Burgett denies telling any doctor this story.

## II. The Experts

Plaintiffs filed suit in Kentucky state court in June 2011. After some jurisdictional wrangling, *see Burgett v. Troy–Bilt LLC,* No. 11–CV–110, 2011 WL 4715176 (E.D.Ky. Oct. 5, 2011), the case was removed to federal district court. As relevant on appeal, Plaintiffs have alleged three claims: two strict products liability claims against MTD, for defective design and defective manufacturing; and a claim for negligent assembly against Lowe's.

To support these claims, Plaintiffs offered the purported expert testimony of Jay Nogan. The district court correctly summarized Nogan's background and expertise as follows:

> Nogan is an experienced mechanical engineer. He graduated from the University of Delaware with a degree in mechanical engineering in 1979. While Nogan is not licensed as an engineer in any state and never sat for a professional engineer exam, he spent twenty-three years working as an engineer on products like submarines, locomotives, trucks, and heavy machinery. In 2002, Nogan transitioned from practicing as a mechanical engineer to working as a

forensic engineer. Since then, he has received training in accident reconstruction and has examined trucks, motorcycles, mobile equipment, and other machinery. Nogan has never designed a lawn mower or otherwise worked for a manufacturer of lawn mowers, but he has inspected riding mowers on two occasions. *Burgett v. Troy–Bilt LLC* ("Burgett Expert"), No. 12–CV–25, 2013 WL 3566355, at \*2 (E.D.Ky. July 11, 2013) (citations omitted). Armed with this expertise, Nogan produced three reports on the accident, addressing purported defects in the mower's design, manufacturing, and assembly.

Nogan generally criticized the design of the mower's seat switch. The switch was not sealed, meaning that contaminants could infect its workings. Based on one experience with a former employer, Nogan opined that condensation could lead to intermittent and unrepeatable electrical issues. If such intermittent issues included short circuits, those events could trick the seat switch into thinking someone was sitting in the seat, even if the seat were empty. Nogan did not identify a feasible alternative design per se, but noted an expired patent that claimed a safety interlock system in a lawn mower started by a pull-cord. Nogan acknowledged that this alternative design would not work on Burgett's MTD mower, because it (like all other modern riding mowers) started with a battery. But Nogan thought this expired patent was "definitely an aid to finding a workable commercially viable solution." (R. 95–9, Nogan Prelim. Rpt., at 2399.) Nogan further noted that MTD had not denied the existence of alternative designs, and since MTD was a "major player" in the market, Nogan "would infer that [MTD was] aware of such solutions but [has] chosen not to incorporate them." (R. 97–10, Nogan Supp. Rpt., at 2627.)

As for any manufacturing or assembly defects, Nogan inspected the mower and found no evidence of any cut wires or other attempts to interfere with the seat switch system. But Nogan concluded that "if a seat switch malfunction is caused by humidity and condensation inside the switch, the problem would not always [be] evident." (R. 95–9, Nogan Prelim. Rpt., at 2397.) However, Nogan did find what he deemed to be a problem with the seat switch's wiring. When he tested the wiring on Burgett's mower with a micrometer, he found unexpectedly high resistance on the wire from the seat switch to a grounded part of the mower—the negative anode. Nogan opined that "enough resistance in a circuit will cause the ground circuit to act as if it is 'open' thereby defeating the" seat switch system. (*Id.* at 2398.) Nogan also stated that "it is more likely than not that the connection of the seat switch green wire to the battery negative cable was defectively manufactured." (*Id.*) However, Nogan noted that Lowe's had handled the battery when they replaced the dead battery in Burgett's mower. If Lowe's had not properly installed the new battery, this could have "exasperated the poor connection." (*Id.*) Nogan did not detect a loose connection when he inspected the mower, but he thought that the connection could become looser when the mower was being used. Despite the purported fault in the wiring, Nogan was never able to replicate the mower behavior that Burgett described.

After Nogan opined on the mower's supposed faults, MTD's own expert—Daniel Martens, MTD's Vice President of Product Development and Safety—tested these theories. Martens has an educational background similar to Nogan, but has had vastly more practical experience working with riding mowers. Martens tested No-

gan's theory on an exemplar mower, and found that "such an 'open circuit' would prevent the tractor from starting but would not otherwise affect the function of the seat switch. In other words, with an 'open circuit,' if the operator inadvertently leaves the seat, the engine will shut off." (R. 95–3, Martens Rpt., at 2090.) Nogan, however, thought that Martens had not truly tested his theory. Nogan further noted that "[t]he potential sites of an intermittent connection in the ground circuits of the subject mower are numerous. This includes both the [ ] Engine Harness and the MTD Chassis Wire Harness." (R. 97–10, Nogan Supp. Rpt., at 2629.) This revised conclusion effectively meant that the faulty wiring could potentially be *anywhere* in the seat switch system, including a possibly loose connection with the battery.

Nogan also opined on biomechanical issues and human factors, meaning the way that men and machines interact. Nogan thought it physically impossible for Burgett to have suffered the injuries he did if the sole of Burgett's foot had been on the ground. Nogan also drew on his experiences as an accident reconstructor to conclude that it was "[d]ifficult to predict what someone will do while trying to keep from being thrown off a tipping mower." (R. 97–11, Nogan Final Supp., at 2633.)

Once discovery ended, Defendants moved to exclude Nogan's testimony and for summary judgment on all of Plaintiffs' remaining claims. The district court granted Defendants' motion to exclude, finding Nogan unqualified to offer his purportedly expert opinions. *Burgett Expert,* 2013 WL 3566355. After a hearing, the court also granted Defendants' summary judgment motion in full. *Burgett v. Troy–Bilt LLC ("Burgett MSJ"),* 970 F.Supp.2d 676 (E.D.Ky.2013). Plaintiffs timely appealed.

## DISCUSSION

### I. EXPERT WITNESS

Under Rule 702 of the Federal Rules of Evidence, "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by 'knowledge, skill, experience, training, or education.' Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litig.,* 527 F.3d 517, 528–29 (6th Cir.2008) (citations omitted) (quoting Fed.R.Evid. 702). With regards to the first requirement, courts do not consider "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit,* 25 F.3d 1342, 1351 (6th Cir.1994). The party offering the expert's testimony has the obligation to prove the expert's qualifications by a preponderance of the evidence. *See Sigler v. Am. Honda Motor Co.,* 532 F.3d 469, 478 (6th Cir.2008).

We note that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal,* 527 F.3d at 530 (quotation marks omitted). Accordingly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir.1998) (quoting *Davis v. Combustion Eng'g, Inc.,* 742 F.2d 916, 919 (6th Cir.1984)). "*Daubert* did not work a seachange over federal evidence law, and the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." Fed. R.Evid. 702 advisory comm. note, 2000 amend. (quotation marks omitted). A

court should not use its gatekeeping function to impinge on the role of the jury or opposing counsel. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

██ The district court held that Nogan was not qualified to give expert testimony in any of the three areas his opinions concerned—electrical issues, biomechanical issues, and human factors. The court noted that Nogan was not an electrical engineer, had taken only two courses on electrical engineering in college in the 1970s, and had very limited experience working with electrical systems and their problems. *See Burgett Expert*, 2013 WL 3566355, at *3. Plaintiffs argued that Nogan was just as qualified as Defendants' expert, but the court rejected this argument as irrelevant—Nogan's qualifications had to be evaluated their own merits. *See id.* at *3–4. In the end, the court found that Plaintiffs had not attempted to demonstrate "how Nogan ha[d] otherwise developed expertise in electrical engineering," and therefore, Nogan was unqualified to testify on these issues. *Id.* at *3. We review this ruling for abuse of discretion, and will only reverse "where the district court renders a manifestly erroneous ruling." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 293 (6th Cir.2007).

The district court did not abuse its discretion in excluding Nogan from testifying about biomechanical issues and human factors. Both of these fields are proper topics for expert testimony. *See Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303–05 (6th Cir.1997) (biomechanics), *abrogated on other grounds by Morales*, 151 F.3d 500; *see also Winters v. Fru–Con Inc.*, 498 F.3d 734, 741 (7th Cir.2007) (human factors). It thus follows that a witness opining on these subjects must be qualified to do so. But Plaintiffs concede that Nogan has admitted that he is *not* an expert in biomechanics or human factors—either by education or training. *See* Appellants' Br. at 15. Nogan might be able to apply some common sense to these issues, but the district court would then be well within its rights to exclude this testimony. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir.2001) ("We agree that such an idea is based on common sense. This means, however, that the district court was well within bounds to conclude that expert testimony on [this subject] ... was inadmissible.").

Nogan's qualifications to opine on electrical issues present a much closer call. Contrary to the district court's suggestion, the mower's seat switch is not a highly complex or "intricate" electrical system. *Burgett MSJ*, 970 F.Supp.2d at 681. And Plaintiffs only needed a witness who met the "minimal qualifications" requirement—not one who could teach a graduate seminar on the subject. *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 851 (6th Cir.1981). If Plaintiffs had put forward a lawnmower repairman, that person would likely have been qualified to opine on a manufacturing defect, even if her educational background was lacking. *See Berry*, 25 F.3d at 1350; *see also Rose v. Truck Ctrs., Inc.*, 388 Fed.Appx. 528, 533–34 (6th Cir.2010). (This was the category that Defendants' expert fell into, broadly speaking.) Similarly, if Plaintiffs' expert had a degree in electrical engineering, her qualifications would probably have sufficed, even absent practical experience with lawnmowers. *See Jahn v. Equine Servs., PSC*, 233 F.3d 382, 389 (6th Cir.2000); *see also Palatka v. Savage Arms, Inc.*, 535 Fed.Appx. 448, 454–55 (6th Cir.2013).

Nogan does not easily fit into either of these categories. Nogan holds a degree in mechanical engineering, is a forensic engineer and accident reconstructionist, and has approximately 30 years of experience with various types of machinery. But Nogan had limited training in electrical engineering, and not a great deal of practical experience. The question before the district court was not whether Nogan was the best qualified expert Plaintiffs could have called upon. *See Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir.2008). The district court only had to decide if Nogan met Rule 702's basic qualifications requirement. However, we need not definitively resolve whether the district court abused its discretion in deeming Nogan unqualified to testify on electrical issues. Even with Nogan's testimony in the record, summary judgment for Defendants was warranted.

## II. DESIGN DEFECT CLAIM

■ We turn to the district court's summary judgment decision, which we review *de novo. Shazor v. Prof'l Transit Mgmt.*, 744 F.3d 948, 955 (6th Cir.2014). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Birch v. Cuyahoga County Probate Ct.*, 392 F.3d 151, 157 (6th Cir.2004).

"Kentucky has adopted Section 402A of the Restatement (Second) of Torts (1965). Under Section 402A, the standard for imposing liability upon manufacturers or sellers of products is whether the product is in a defective condition unreasonably dangerous to the user or consumer." *Morales,*

151 F.3d at 506 (quotation marks and citation omitted). "Liability may be imposed on the manufacturer of a defective product under a variety of theories. Liability may result from defective design, for manufacturing defects, and for failure to warn." *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 250 (Ky.1995) (citations omitted), *overruled on other grounds by Martin v. Ohio County Hosp. Corp.*, 295 S.W.3d 104 (Ky.2009). "The plaintiff has the burden [ ] to establish causation under the substantial factor test—that is, plaintiff must prove that the defendant's conduct was a substantial factor in bringing about plaintiff's harm." *King v. Ford Motor Co.*, 209 F.3d 886, 893 (6th Cir.2000).

"Kentucky applies a risk-utility test in design defect cases." *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 42 (Ky.2004). The test in these cases is "whether an ordinarily prudent company being fully aware of the risk, would not have put the product on the market." *Id.* (quotation marks and alterations omitted). Therefore, "design defect liability requires proof of a feasible alternative design." *Id.* Plaintiffs' design defect claim must fail because they have not satisfied this requirement, even if we consider Nogan's testimony. The closest Nogan came in his three expert reports was to point to a design contained in an expired patent. This design concerned a push-mower started with a pull-cord. Nogan conceded that the design would not work on motors started with a battery—a category that includes every riding mower currently on the market. But Nogan posits that MTD should have been able to design some other seat switch system based on the pull-mower technology. Nogan does not even begin to suggest what this alternative design might be. In sum, Nogan's hypotheticals do not satisfy Plaintiffs' need to put forward a proof of a

feasible alternative design.[1] *See Nissan Motor Co. v. Maddox,* 2013 WL 4620488, at *6 (Ky.Ct.App. Aug. 30, 2013); *Garlock Sealing Techs., LLC. v. Robertson,* No. 2009–CA–000483–MR, 2011 WL 1811683, at *3 (Ky.Ct.App. May 13, 2011).

### III. MANUFACTURING DEFECT AND NEGLIGENT ASSEMBLY CLAIMS

We turn next to Plaintiffs' interlinked claims of manufacturing defect (against MTD) and negligent assembly (against Lowe's). "Under Kentucky law, a manufacturing defect exists in a product when it leaves the hands of the manufacturer in a defective condition because it was not manufactured or assembled in accordance with its specifications." *Greene v. B.F. Goodrich Avionics Sys., Inc.,* 409 F.3d 784, 788 (6th Cir.2005). Plaintiffs must prove that any manufacturing defect was a substantial factor in bringing about the harm to Burgett. *See id.* As for the negligence claim against Lowe's, Kentucky law unsurprisingly requires Plaintiffs to establish three elements to succeed: "(1) a duty on the part of the defendant; (2) a breach of that duty; and (3) consequent injury." *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245, 247 (Ky.1992).

Nogan was never able to precisely identify a manufacturing or assembling defect. Nogan did identify one wire that had unusually high resistance, and suggested that any problems with the seat switch could have been exacerbated if Lowe's had not installed the replacement battery properly. But Nogan later expanded his diagnosis to some problem with the electrical system as a whole. Furthermore, Nogan failed to replicate the fault that Burgett described, despite several tests. Thus, even if we consider Nogan's testimony, Plaintiffs' defect theory boils down to *res ipsa loquitur.* Burgett testified that the mower continued to run after he fell out of the driver's seat. A riding mower does not behave like this unless *something* is wrong with it.

Kentucky law allows a plaintiff to proceed on this type of circumstantial evidence. *See Holbrook v. Rose,* 458 S.W.2d 155, 157–58 (Ky.1970). But if Plaintiffs want to do so here, they must "negate other possible causes for the failure of the [mower] to function properly," *Perkins v. Trailco Mfg. & Sales Co.,* 613 S.W.2d 855, 858 (Ky.1981), for which each respective Defendant "would not be liable." *Siegel v. Dynamic Cooking Sys., Inc.,* 501 Fed. Appx. 397, 401 (6th Cir.2012). Plaintiffs' own theory of the case makes this obstacle insurmountable. They hypothesize that some defect existed in the seat switch system, or perhaps the problem was created (or exacerbated) by Lowe's when the mower's battery was replaced. Plaintiffs have no competent evidence by which a jury could find that MTD or Lowe's was responsible for the unidentified fault, much less evidence that the unidentified fault was a substantial factor in bringing about Burgett's injury. As we have stated in the past, "[w]here an incident could result from more than one cause, plaintiff tips the balance from possibility to probability only by ruling out other theories of causation: Where an injury may as reasonably be attributed to a cause that will excuse

---

1. In their reply brief on appeal, Plaintiffs mention—for the first time in this litigation—two other alternative designs that Nogan has put forward. *See* Appellants' Reply Br. at 12. Nogan did not identify these alternative designs in any of his three expert reports, but rather during his deposition. Plaintiffs did not raise these designs in their brief before the district court, in the oral argument on the motion for summary judgment, or in their opening brief on appeal. It is far too late for Plaintiffs to raise new arguments in an attempt to salvage an essential element of one of their claims. *See Barany–Snyder v. Weiner,* 539 F.3d 327, 331–32 (6th Cir.2008).

the defendant as to a cause that will subject it to liability, no recovery can be had." *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 219 (6th Cir.1982) (alteration and formatting omitted) (quoting *Sutton's Adm'r v. Louisville & Nashville R.R.*, 168 Ky. 81, 181 S.W. 938, 940 (1916)). Both MTD and Lowe's were entitled to summary judgment.

## CONCLUSION

For these reasons, we **AFFIRM** the judgment of the district court.

STRANCH, Circuit Judge, concurring.

I concur in the majority opinion—I agree that even if Nogan's testimony had been admitted, summary judgment for the Defendants was appropriate. I write separately to address an issue not necessary to resolution of this case—the apparent confusion here and in a number of cases regarding the admissibility of expert testimony. This recurring issue arises at the intersection of the expert requirements of qualification, relevance and reliability and the nature of our adversary system.

Consider this case. Nogan holds a degree in mechanical engineering, has been trained as a forensic engineer and accident reconstructionist, and his 30 years of experience with machinery large and small has included some work with the electrical systems in machinery. His CV indicates that he has experience with electrical generator sets, electrical and noise control engineering, and electro-mechanical interfaces. Is he qualified to assist the jury in understanding whether a wiring problem in the mower might have led to the accident at issue? I think so. Defendants argue that more is required but, as we have noted before, a generally experienced expert's "unfamiliarity with some specific aspects of the subject at hand merely affect[s] the weight and credibility of [the] testimony,

not its admissibility." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 294 (6th Cir.2007) (internal quotation marks omitted). "An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact." *Dilts v. United Grp. Servs., LLC*, 500 Fed.Appx. 440, 446 (6th Cir.2012), *cert. denied*, —— U.S. ——, 133 S.Ct. 2022, 185 L.Ed.2d 885 (2013). Our sister circuits agree: "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization the court considers most appropriate." *Pineda v. Ford Motor Corp.*, 520 F.3d 237, 244 (3d Cir.2008) (internal quotation marks omitted). The qualification inquiry does not ask which expert would be the *best*; Rule 702 simply asks whether the expert proposed by the party is qualified "by knowledge, skill, experience, training, *or* education."

But being qualified as an expert is only the first step—the proposed expert must offer testimony that is relevant and reliable. In *Rose v. Truck Ctrs., Inc.*, 388 Fed.Appx. 528 (6th Cir.2010), the district court excluded the plaintiff's expert, a truck mechanic, from giving testimony on the cause of an accident, noting that the expert had never designed or manufactured a steering gear for a truck. Because his testimony would assist the trier of fact to understand the evidence, we found the expert qualified but affirmed exclusion because the expert's testimony was not sufficiently reliable. *Id.* at 534–36. Perhaps reliability of the expert opinion was an issue below. But the point is that the issue of qualification of the expert—will the expert's testimony help the trier of fact?—is a separate inquiry and should not

be confused with the issue of the reliability of the proposed testimony.

As to qualifications and reliability, moreover, the majority aptly reminds that "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system." Fed.R.Evid. 702 advisory comm.'s note, 2000 amend. (quotation marks omitted). In our legal system, "rejection of expert testimony is the exception" not the rule, *In re Scrap Metal Antitrust Litigation,* 527 F.3d 517, 530 (6th Cir.2008), and credibility of an expert witness and weight to give her testimony are matters entrusted to the trier of fact. As *Daubert* notes, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).